Chief Justice Bibb
delivered the Opinion of the Court.
John Patrick had judgment in ejectment against Joseph Todd, as tenant in possession, and Samuel Estill, who was permitted to defend with him.
September 1817, Estill exhibited his bill to have, relief against the legal title of Patrick, obtained under Mayo’s patent of 1,000 acres, of the 11th January 1795, relying for his equitable right on the validity of an entry of James Estill, of the 17th January, 1782, on Treasury warrant, surveyed the 27th February, 1810. and patented 20th November, 1810. Patrick relied in answer, on the elder grant, as giving him the better right, and generally on the illegality and insufficiency of the claim of Estill
This claim, so set up, can not entitle the complainant to relief. The survey was executed after the time limited for surveying; the complainant has not attempted, by allegation or proof, to bring the survey of 1810 within any of the provisoes of the statutes. Upon this bill and his exhibits, he had stated his claim so as to show it contraband and forfeited in law. The cases of Shield’s heirs vs Bryant, 2 Marsh. 344; Pitman vs Caldwell, same, 263; Brown vs Starke, same, 29; and Morgan’s heirs vs Fox’s, 4 Bibb, 565, have sealed that point; and that it is a defect on the face of the bill if the survey is not brought within the exceptions of the statute.
But on the 6th of March, 1819, the complainant added the title of Adam Woods, conveyed to him on the 4th February, 181.9; this entry depends on Joins Woods, and is as follows:
- “May 11th, 1780, John Woods eiders 400 acres on a Treasury warrant, on a west branch of Muddy creek; the first brand below Little Muddy creek,, running up and down for quantity.” Surveyed December 12th, 1783,
Adam Woods’ entry.
Allegation as to the derivation of title from Woods.
Patrick’s answer to the original bill on Estill’s entry, and statement of the interferences.
Answer to the amended bill which relied on Woods’ claim.
*307 "December 19th, 1781, Adam Woods, assignee, &c. enters 300 acres, beginning at the south west corner of John Woods’ entry of 400 acres, below the mouth of Little Muddy creek; then north and west, for quantify.” Surveyed 12th November, 1797 — patented to Adam Woods May 12th, 1802.
In this amendment to his bill, the complainant alleged, that the survey of Estill, first relied on, and that of Adam Woods, now set up, rover the same, land which Patrick recovered in ejectment. To give color to his equity, he alleges that although the deed of Woods to him was not executed until February 1819, he had a bond from Woods for blank acres, which is referred to by a blank date, and that under his equitable right from Woods, he had treated the land as his own from the date of the bond, and put tenants on it; and in fact, had sold the greater part to Joseph Todd, who lived on the land and claimed it under the complainant.
Rut the complainant has not produced any writing before the deed of 1 819 from Woods. That lie claimed under Woods’ entry, or settled any tenants uder that survey, or that Todd or himself had any interest in that claim before the deed, there is no color of proof.
There is a small interference between Wood’s patent, and Estill’s — but Mayo’s patent is for 1,000 acres, and includes as well that interference between Estill and Woods, as the residue of Woods, not conflicted with by Estill, So far as the condition with Estill’s patent and Mayo’s patent had been made the subject of controversy by the original bill, Patrick had responded and relied on his elder title; he had not denied the allegations, that complainant had sold to Todd a part of Estill’s patent; and that the complainant had made himself a defendant in the ejectment with Todd, it is to be remarked that Estill’s patent lies principally without Mayo’s; the connection between Estill and Mayo was only about ninety acres; and that is alleged to he the recovery in ejectment, and is the admission of Patrick.
But in responding to the amended bill, Patrick *308 not only denied the validity of Woods’entry, but denied all the statements except the conveyance of 1819; protested against the complainant’s right to. bring Woods’ entry and patent into the litigation; alleged himself in possession, and relied on the statute for the speedy adjustment of land claims
Proof, as to Patrick's possession.
Can the junior patentee maintain his bill on his entry, against the elder grantee 24 years after its date, where either ever had possession?
Cases depending on parol evidence, and the memory of witnesses, for 40 years.
Patrick proves an entry upon his purchase under Mayo’s patent, and a division and compromise of a confliction with John Woods’ 4000 acres in 1807; hut he does not prove any actual settlement and continuation of actual possession, so as to make the act of limitation of seven years apply.
Nevertheless, the grant to Mayo bears date 11th January, 1795 — Woods’ entry of 300 acres, is antecedent to the patent; and now. supposing no possession under Woods’ entry and survey, and none under Mayo; the question arises whether, after the lapse of time between 11th January, 1795, and the amended bill in 1819 (a period of 24 years,) during all which, those claiming Woods’ 300 acres, have acquiesced in, and submitted to the outstanding legal title, a court of equity will lent! its aid to revive an equity so stale and so long neglected. For if it be true, that no possession has been taken or held under Woods’ claim, then the cause of action in equity was the same in 1795, that it is in 1819 — the elder grant is the cause and gravamen of complaint.
But that is not all; the litigation now must carry the questions back to 1780 and 1781, and involve the degrees of information which existed in those years, as to the special calls of John Woods’ and Adam Woods’ entries. When Little Muddy acquired notoriety by that name, whether Woods’fork or Ogg’s branch were known by those names as early as May 1780; what was then understood as the first branch below Little Muddy creek, are questions of consideration in deciding on the entries of John Woods and Adam Woods. These questions, he told others about the validity of entries, of notoriety and specialty, of the locative descriptions, depend on parol testimony, on the memory of witnesses, on the number of the living and the dead? *309 Who were, at the date of the conflicting entries, acquatuted in the neighborhood or nearest settlements.
Call on the bar to investigate the question.
Discussion of the calls of Woods’ entry.
The question stated, is not without its To the interest and welfare of the community, it is important. Much depends on the settling of it properly. We do not find it necessary to settle it now; but we mention it, that the gentlemen of the bar may think of its importance; so that when it becomes necessary to decide the question, they may be prepared to aid the. court with the sunshine of study and research, rather than by the meteoric flashes of the moment. Impressed with this truth, that the gentlemen of every bar may, by their researches and discussions, contribute much towards lessening the labors and advancing the reputation of the bench, we invite the attention of this bar to the question, proposed with a desire to derive benefit from their investigations.
The entry of 400 acres and of 300 appendant, are not free from difficulties. It is not clear whether Ogg’s branch or Woods’ fork, represented on the plat, was intended, or best suited in 1780, the description in Woods’ entry of “the first branch below Little Muddy creek.” Roth run in on the west side of Rig Muddy; and Ogg’s branch is, in fact, the first below Little Muddy. n that, the entry of 400 acres might be, laid in a square, including the whole stream: it is short, and the survey would extend westwardly, above its head. But it is a very small branch, putting into Rig Muddy. So are Stony creek, Lee’s branch, Cedar run, Shawanee run. &o. very minor brandies of the Kentucky river. Woods’ fork is also a very small branch of Big Muddy. Neither Ogg’s branch nor Woods’ fork had names at the date of Woods’ entry of 400 acres. Woods’ fork is so long as to produce great difficulty and doubt, whether that could have been intended, as the locator has given no part of it, neither head nor mouth as the starting point. If the survey of 400 acres be in a square, commencing at the mouth and running up on both sides, it will extend somewhat more than half way up Woods’ fork, as represented. If it be in a square, including *310 tire bead, then down on both sides, it will be variant from the. former survey in so great a degree, that the entry of 300 acres on the west, when surveyed from the first, and then from the second position of the 400 acres, would also occupy very different lands; but whether these two varying positions for the 300 acres, would yet have- an acre of land common to both, depends upon where the head of Woods’ fork shall happen to be fixed, if the survey of 400 acres for John Woods’entry, be extended from the mouth to the head of Woods’ fork, and to include both month and head, then it is essential to fix the head. And upon that, will depend the question, whether Woods’ 300 acres, adjoined to the 400 acres when surveyed, as last proposed, will include any one acre of the actual survey, made on that entry. This brings the matter to a very doubtful issue, according to the representation of Woods’ fork on the plat returned, in this cause. It brings the question to one of accurate admeasurement of distance from the mouth, to that which shall he fixed as the head of Woods’ fork. If the stream does head in fact, in longitude, west of the actual survey of the three hundred acres, then it is clear that, by no construction which can be admitted, could any part of the land in controversy, be decreed to the complainant. That fact, of a head westwardly of his present survey being ascertained, then John Woods’ entry of four hundred acres, pushes the entry of Adam Woods so far west, as to leave no part of the land now claimed to he taken by the entry of three hundred acres. If the head of the stream be fixed by the plat returned in this cause alone, then perhaps Woods’ three hundred acres, fixed upon the mode, of establishing the four hundred acres on Woods’ fork, from head to mouth, and adjoining the appendant entry on the west, might include some very small part of the land in controversy.
Surveyor’s report is evidence that the objects delineated exist on the ground, but not that objects not laid down, do not exist.
*310 But to proceed on the supposition that the delineafion of Woods’ fork is accurate and full, has its objections. The surveyor’s report does not profess this stream has been delineated from actual ad-measurement; it gives no distances nor courses; no? *311 does it profess to be a full delineation of the stream, with all its branches and their heads. It is a representation simply, to the view, by delineation the stream. That his attention, or the attention of either party, was called to the finding of the most westwardly heads of Woods’ fork, does not appear. Be that as it may, there is nothing in the surveyor’s report to warrant the conclusion, that, he means to assert on his oath of office, that he has delineated this stream in ail its extent, brandies and headings. We mean not to detract from that due weight which a surveyor’s report; is entitled to have, as evidence of what is to be seen on the ground, and as far as it is in the affirmative: but we do not mean to extend to it so much credence as that there is nothing more to be seen than what he. has reported. For general purposes and general views of the relative bearings and branches of streams, a delineation without actual survey and admeasurement in every part, with suffice. There are some strong warnings of experience, against carrying too far this kind of evidence, by mere eye view of a stream on a plat, and basing thereon the precise, and critical constructions and directions for surveying entries. By such faith in mere delineations without farther explanation by the surveyor, the courts below have, in several instances, been greatly perplexed lo execute the mandates of the appellate court in laying down entries, because the plat upon which the appellate court framed their directions, did not agree with stubborn facts of nature, appearing on an accurate admeasurement. And alien those same cases came back for a review of the construction and execution of the mandate given by the court below, the. appellate court has been in great difficulty to apply their own mandates and decrees, no longer within their control, to the new state of facts.
Delineation of water courses on the original plat and certificate returned by the surveyor, is evidence.
But if the delineation of Woods’ fork on the plat, is to be evidence of the extreme westwardly heading of that stream, so is the, delineation of it upon the original plat and certificate of survey, filed by complainant. That plat shews that there is a branch of Woods’ fork, (not represented on the plat re turned under the order of the court,) which heads *312 west of the western boundary of the three hundred acres, runs eastwardly, crosses that western boundary, and unites with the brandies which runs across the southern boundary. The correspondence between the two plats, as far as the stream is represented on both, is as striking and as convincing as the omission of one of those branches on the plat, returned in obedience to the order of survey in the case.
Complainant not having made out a clear case on his elder entry, the elder grant prevails.
Caperton, for appellant; Barry and Depew for appellee.
The entry of four hundred acres gives no point on the branch; it calls neither for the head nor the mouth; the locator himself has taken his entry as giving him latitude to survey any where on Woods' fork, and has included neither the head nor the mouth. Although we are inclined to the belief, under the circumstances and proof, that Woods’ fork ought to be taken as the branch alluded to in 1780, yet we are not able to discern that the complainant has made out an equity sufficiently clear to divest Patrick of his legal title. If the head of Woods’ fork be as represented in the original pint and certificate of survey of Woods’ 300 acres, it is clear, that the entry of 300 aeres can not, by any process of construction which is reasonable or conformable to precedent, be made to include any part of the. land in controversy. The original survey was made of the 300 acres on the 12th November, 1797 — the survey in the cause was made in June 1819. The difference between the two surveyors may be, owing to the difference of the stage of water in 1797 and 1819, or between the water of November and June. The weight of evidence is certainly in favor of the plat of 1797. That is in the affirmative and positive; the plat of 1319 is merely silent. The denial of the existence of such a western branch, and thereby to produce a contradiction between the plat of 1797, and that of 1819, would be a strained construction. It would be to overrule a positive affirmative, by an implied negative.
The decree dismissing the bill must be affirmed with costs.